Woodrow FERGUSON, G. C. Ferguson, Berney Ferguson, Maude Eoff, Elvin Hubbs, Lena Wilson, Beulah S. Drake, and R. J. Evans; and Homer Henderson, Plaintiffs-Respondents,

UNION ELECTRIC COMPANY OF MISSOURI, a Corporation, Defendant-Appellant.

No. 45572.

Supreme Court of Missouri, Division No. 1.

Sept. 9, 1957.

Rehearing Denied Oct. 14, 1957.

Harry H. Kay, Eldon, H. C. Salveter, Sedalia, John A. Woodbridge, St. Louis, of counsel, for appellant.

George H. Miller, Sedalia, Ralph B. Nevins, Hermitage, for respondents.

WESTHUES, Judge.

Plaintiffs, nine in number, filed this suit against the Union Electric Company of Missouri for damages to their crops caused by floodwaters in June and July, 1951. The petition, consisting of seven counts, involved the flooding of land on five farms, two of which were located on the Osage River, two on the Pomme de Terre River, and one on Hogles Creek. The last two streams are tributaries of the Osage River. Plaintiffs' claims were based on the theory that a dam constructed and operated by the defendant at Bagnell, Miller County, Missouri, caused plaintiffs' lands to be flooded. The specific grounds of recovery were that the lake formed by the dam caused silt to be deposited in the sloughs and river beds so as to cause the floodwater to rise higher than it normally would, that the defendant negligently failed to open the floodgates at the dam, and permitted the water in the lake to rise above the 660 feet elevation (above sea level) which was considered to be a normal full reservoir. It was claimed that because of the silt and the high level of the water in the lake, the flow of floodwater was retarded thereby causing plaintiffs' lands to be overflowed.

A trial in the Circuit Court of Hickory County, Missouri, to which county the case was transferred from Benton County where the suit had been filed, resulted in a judgment for plaintiffs on each count aggregating a sum of $39,055.99. From the judgment entered, the defendant appealed.

All of the points briefed on this appeal have to do with instruction No. 2, given on plaintiffs' behalf, and the admission of evidence given by one Earl Beckner.

This is the second appeal of this case. On the first appeal, a judgment for plaintiffs in the sum of $38,671.90 was reversed and the case remanded because of an error in an instruction. See Ferguson v. Union Electric Co. of Missouri, Mo., 282 S.W.2d 505. That case and the cases of Kennedy v. Union Electric Co. of Missouri, 358 Mo. 504, 216 S.W.2d 756, and Grace v. Union Electric Co., 239 Mo.App. 1210, 200 S.W. 2d 364, may be read for a full description of the dam and the lake. For the purposes of this case, it is sufficient to say that the dam at Bagnell, constructed between 1929 and 1931, caused the Lake of the Ozarks to form and that when the stage of the water therein is at 660 feet above sea level, it is considered to be at full reservoir. Easements of the defendant extend to an elevation of 673 feet. When the water in the lake is at a level of 660 feet, it extends westwardly from the dam for about 125 miles where it is spanned by the County Line Bridge at the boundary line between Henry County and St. Clair County, which point is about 30 miles west of Warsaw, Missouri. All of the farms involved in this lawsuit are located west of Warsaw. The Pomme de Terre River is about 14 miles west of Warsaw and Hogles Creek empties into the Osage a short distance to the west of the Pomme

de Terre. The lands on which the crops were damaged were at an elevation above 673 feet.

It was conceded that plaintiffs' lands were flooded; also that the crops on these lands at the time were destroyed. No point was made that plaintiffs were not damaged. The point in dispute is whether the evidence was sufficient to authorize a verdict for plaintiffs. Defendant's objections to instruction No. 2 are, in the main, based on the theory that the evidence was insufficient to sustain the questions submitted to the jury.

Instruction No. 2 follows:

"The Court instructs the jury that if you find and believe from the evidence that in the months of June and July, 1951, the defendant Union Electric Company, owned and operated a hydro-electric dam across the Osage River at Bagnell, Missouri, and if you further find that said dam impounded the waters of the Osage River, creating a reservoir which at full stage of 660 feet above mean sea level extended from Bagnell, Missouri, to approximately the county line between Henry and St. Clair Counties; and if you further find that Plaintiffs' farms in question were either upon or nearby the said reservoir as it extended above Warsaw, Missouri; and if you further find and believe that as a result of the construction, operation and maintenance of the dam at Bagnell by the Defendant silt deposits had been formed in the channel and along the banks of the Osage River in and around Warsaw and to a lesser degree at the various places mentioned in evidence up the river to Smart Island by June, 1951; and if you further find that said silt deposits retarded the flow of the Osage River and its tributaries in the vicinity from Warsaw, Missouri west past Plaintiffs' farms in June and July 1951 thereby causing the flood waters of the Osage River to go upon Plaintiffs' farms in June and July 1951 and destroy the crops in question; and if you find and believe from the evidence that under all the conditions then and there existing the Plaintiffs' crops would not have been flooded had it not been for the maintenance and operation of the said Bagnell Dam by Defendant (if you so find); and if you find that the destruction of Plaintiffs' crops in question (if you so find) directly and proximately resulted from the construction, maintenance and operation of said dam;

"If you find all of the above statements to be true and if you further find and believe that in addition to passage ways for the impounded water to reach the electrical generation turbines there were in June and July 1951 12 flood gates in said dam for the purpose of allowing flood water coming into said reservoir to pass said dam; and if you find and believe that said flood gates were of such number, size and capacity to allow the flood water which would have flowed by Plaintiffs' farms in June and July, 1951, to pass said farm and thence through said dam without causing the overflow and destruction of the crops in question on Plaintiffs' farms; with the exception of those flood waters, if any, which you may find to have been caused to go upon Plaintiffs' crops because of the silting, mentioned in evidence, if any, and if you do so find; and if you further find and believe that Plaintiffs' crops in question, and for which they ask damages from the Defendant were flooded and destroyed in the latter part of June and the early part of July, 1951; and if you further find that said flood or overflow waters were caused to go upon Plaintiff's lands because of the failure of the Defendant to use ordinary care to open the flood gates sufficiently at said dam; and if you further find and believe that the Defendant

either knew or by the exercise of ordinary care should have known that sufficient flood waters would flow past Plaintiffs' farms, or into upper reaches of the lake in the latter part of June and in July 1951, to cause Plaintiffs' farms to be flooded and their crops destroyed unless the flood gates at said dam were opened sufficiently to allow said water to pass without flooding said farms; and that the Defendant either knew, or by the exercise of ordinary care should have known such fact, if you find it to be a fact, in time thereafter for the Defendant in the exercise of ordinary care to have prevented such overflow and damage to Plaintiffs' crops by opening the flood gates sufficiently at the dam; and if you further find and believe that in failing to open the flood gates sufficiently at the dam to allow said flood water to pass without destroying Plaintiffs' crops that Defendant failed to use ordinary care and was negligent; and if you further find and believe that said negligence, if any, was a direct and proximate cause of the destruction of each and all of Plaintiffs' crops in question then your verdict will be against the Defendant and in favor of the Plaintiffs; unless you further find and believe from the evidence that Plaintiffs' damages, if any, were caused by an unprecedented rainfall in such amounts that plaintiffs' crops in question would have been destroyed even though Defendant's dam had never been built."

The jury was also given instruction No. 5, as follows: "The Court instructs the jury that if you find and believe from the evidence that Plaintiffs' crops were flooded in June and July, 1951, by reason of more rainfall than the creeks and rivers could carry away at the time and that Plaintiffs' said crops would have been flooded and destroyed in June and July, 1951, even though Defendant's dam had never been built, then your verdict must be for the Defendant."

The first of defendant's contentions is that there was no substantial evidence that silting retarded the flow of the Osage River and its tributaries near plaintiffs' farms so as to cause the floodwaters to rise higher and to destroy their crops. We shall briefly relate some of the evidence on this point which, in our opinion, was sufficient to submit the question to a jury. That there was a substantial amount of silting was proven beyond any question. Many of defendant's witnesses so testified. The only dispute was as to the amount. It was in evidence that before the dam was constructed the Pomme de Terre and the Osage were free flowing streams with shoals, gravel bars, and holes of water; that since the dam was built, silt had been deposited along the banks and in sloughs in some places 10 to 20 feet in depth; that one resort owner was forced to move a boat dock several times because of the silting. Many of the sloughs had been filled; at some points the main channel of the stream had been reduced about 20 to 25 per cent. Many of these witnesses who had lived in the neighborhood of these farms for many years testified that in their opinion the silting had retarded the flow of the water and caused it to rise higher than before the silting occurred.

T. C. Horstman, a civil engineer with considerable experience in hydraulics, testified that he made an extensive study of the causes of the flood of 1951. His evidence was that the high level of the lake and silting caused the floodwaters to flood plaintiffs' crops. This witness expressed the opinion that the high level of the lake was the principal cause of the flood but that the silting was a contributing cause. His explanation was that a flood naturally dissipates as it moves downstream; that "this dissipation could be accounted for by water finding places along the sides of the river banks, sloughs, small streams that

are not in overflow condition, coves, or any place that will hold water for a period of time." This evidence corroborated that of the witnesses living in the neighborhood of the flooded lands in question that the silting caused floodwaters to rise higher than before the silting had occurred. It is evident that defendant's first point is without merit. See Kennedy v. Union Electric Co. of Missouri, supra, 216 S.W.2d loc. cit. 763(11).

We shall combine the next two objections made by the defendant to instruction No. 2. Defendant says there was no substantial evidence that the construction, maintenance, and operation of the dam by defendant caused plaintiffs' crops to be flooded in June and July, 1951. Further, that there was no substantial evidence that the defendant was negligent in failing to open the floodgates sufficiently to permit water to pass without flooding plaintiffs' lands. The record shows that from June 21 to June 30, 1951, some rain fell each day except on June 27. A witness for the defendant stated that the official records showed that during the month of June 11.12 inches of rain fell in the Osage basin; that the average for June was about 5 inches. The lake stage on June 21 was 658.1 feet, about 2 feet below full reservoir. From June 21 to June 30, the defendant permitted the water in the lake to rise each day except on June 22 and June 27. On June 30, the lake stage was 662.5 feet and on July 7, when the crest of the flood occurred, the lake stage was 664.4 feet. The defendant admitted that it obtained daily reports from many points west of Warsaw showing the stage of the rivers and the amount of rainfall. It was also admitted that the floodgates at the dam were more than adequate to have handled all the water and kept the lake elevation down to 660 feet.

Witnesses disagreed on the question of whether the lake water had any effect on the flow of the water in the streams at plaintiffs' farms. Defendant's witnesses testified it did not. Their contention was the same at the first trial. See Ferguson v. Union Electric Co. of Missouri, supra. Mr. E. I. Myers, a civil engineer who had made a special study of hydraulics, testified that the lake had no effect on the waters passing plaintiffs' farms and it was his opinion that plaintiffs' lands would have been flooded even if there had been no lake. However, this witness testified that at Warsaw the lake waters do slow down the flow of the water. Note his explanation of this opinion:

"Q. All right. Now, Mr. Myers, tell the jury whether or not the behavior of the river at Osceola is, in your opinion, more important in determining whether these farms, which lie between Osceola and Warsaw, are affected, than is the behavior of the river at Warsaw? A. Well, of course, at Warsaw you definitely have an effect from the pool level of the lake, it extends through gauge site at elevations such as we had in the '51 flood, and the effect of that lake does reach some little distance upstream from Warsaw. My calculations indicate that it is just above the mouth of the South Grand. Beyond that point you get into natural channel characteristics of where your high water slope substantially parallels the bottom of the channel."

The mouth of the South Grand is below any of plaintiffs' farms. Witnesses for plaintiffs testified that the lake waters did have an effect on the waters flowing by plaintiffs' farms. Many of these witnesses were farmers in that vicinity and they testified that by observation they could determine that the flow of the streams had been slowed down by the lake waters. The evidence of T. C. Horstman, referred to above in disposing of the first objection to instruction No. 2, was that the water in the lake was the principal cause of plaintiffs' lands being flooded in 1951. We, therefore, rule that the evidence was sufficient for a jury to find that the presence of the lake and the maintenance and opera-

tion of the dam caused plaintiffs' crops to be destroyed by the flood.

In Cunningham v. Union Electric Co., Mo.App., 221 S.W.2d 758, loc. cit. 761, the case was submitted to a jury by an instruction similar to the submission in the first part of instruction No. 2 in this case. No question of negligence was presented in the Cunningham case. Since the instruction in the present case was in the conjunctive and the jury was required to find all of the facts therein hypothesized, we need not determine whether the evidence was sufficient to find that the defendant was guilty of negligence in failing to open the floodgates sufficiently to keep the water level at 660 feet. Palmer v. Lasswell, Mo., 287 S.W.2d 822, loc. cit. 827(2–4); Wilson v. Kansas City Public Service Co., Mo., 291 S.W.2d 110, loc. cit. 118(18). Certainly, a jury was authorized to find that defendant was mistaken in its theory that the lake and the silt had no effect on the floodwaters at plaintiffs' farms. Defendant's witnesses, learned and experienced engineers, no doubt honestly and sincerely advanced the theory that the lake waters and the silt had no effect on the floodwaters at plaintiffs' farms. However, it was admitted that the lake did affect the flow of the Osage at Warsaw. Defendant's expert witness Myers fixed the point where it ceased to have any effect a few miles west of Warsaw. So, if the lake level rose above 660 feet then, naturally, the point of interference with the flow of water would be farther to the west and closer to the lands in question. Witnesses also disagreed sharply as to whether the silting had any effect on the floodwaters. We cannot say that plaintiffs' theory was unreasonable, that is, that the filling of the sloughs and a portion of the channel of the river had the effect of diminishing the dissipation of the flood of the Osage as it passed downstream from Osceola to Warsaw. Osceola is located to the west of Warsaw upstream from all of plaintiffs' farms.

We, therefore, rule that instruction No. 2 was amply supported and did not erroneously submit the case to the jury. Kennedy v. Union Electric Co. of Missouri, supra; Grace v. Union Electric Co., supra; Cunningham v. Union Electric Co. of Missouri, supra, 221 S.W.2d loc. cit. 764(4).

We see no merit in defendant's contention that instruction No. 2 assumed any disputed fact issue. The instruction required the jury to find, before authorizing a verdict, that the impounded waters in the lake caused silt deposits at Warsaw and westerly therefrom "thereby causing the flood waters of the Osage River to go upon Plaintiffs' farms in June and July 1951 and destroy the crops in question; *and if you find and believe from the evidence that under all the conditions then and there existing the Plaintiffs' crops would not have been flooded had it not been for the maintenance and operation of the said Bagnell Dam * * *.*" (Emphasis ours.) The wording of the instruction was such that it required the jury to find for the defendant unless the jury believed and found that maintenance and operation of the dam caused plaintiffs' crops to be destroyed by the flood in question.

The last point as to instruction No. 2 is that it gave the jury a roving commission to find for plaintiffs on any theory even though not submitted. That same argument was made to a similar instruction in Cunningham v. Union Electric Co. of Missouri, supra, 221 S.W.2d loc. cit. 764 (4). The Kansas City Court of Appeals there ruled the point against the defendant. We approve that ruling.

Defendant, in its last two points briefed, says that the trial court erred in permitting witness Earl Beckner "to give his opinion as to the difference in the height that the water reached on plaintiffs' farms in 1951 above elevation 673 and in 1935 above the same elevation" and in permitting him to compare the 1929 flood

with that of 1951. The two points may be considered together. The objection was based on the theory that the hypothetical question asked the witness assumed facts not in evidence. Defendant has referred us to the objection made; it covers three full pages in the record. In the objection it was stated that the question assumed that the silting occurred between 1929 and 1951 whereas in the first part of the question it was assumed that the silt had accumulated after 1935. That difference is of no importance so long as the silting occurred after the dam was constructed and before 1951. The record shows that a number of witnesses were asked directly whether the silting, about which the witness testified, was present in 1951 and the answer was in the affirmative. Other witnesses were not asked the direct question either by the defendant's counsel or by plaintiffs'. It seems that the parties understood that the silting referred to had occurred before 1951. Objection was made that the question assumed silting had occurred in the mouth of the "Little T-Bone River" when in fact there was no such stream. The record does show that there was a "Little Tebo River." The variance in our opinion is immaterial. Objection was made that the evidence did not show the amount of silting assumed in the question. Witnesses gave estimates of the amount of silt deposits at various points from zero to 30 feet and testified that a number of the sloughs had been filled with silt. We do not find any material fact stated in the hypothetical question that did not have support in the record.

The law governing cases of this nature has been considered and fairly well established by our appellate courts in a number of cases wherein the Union Electric Company was defendant. See Grace v. Union Electric Co., 239 Mo.App. 1210, 200 S.W.2d 364; Kennedy v. Union Electric Co. of Missouri, 358 Mo. 504, 216 S.W. 2d 756; Cunningham v. Union Electric Co. of Missouri, Mo.App., 221 S.W.2d 758; and this same case on the former appeal,

Ferguson v. Union Elect. Co. of Mo., Mo., 282 S.W.2d 505.

We have considered all of the points briefed and have concluded that the judgment should be affirmed.

It is so ordered.

All concur.