Farrell E. BRESHEARS, Eva M. Breshears, Edwin Breshears and Helen Breshears, Plaintiffs-Respondents,

v.

UNION ELECTRIC COMPANY OF MISSOURI, a Corporation, Defendant-Appellant.

No. 46143.

Supreme Court of Missouri,

Division No. 1.

May 12, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied June 9, 1958.

H. C. Salveter, Sedalia, Harry H. Kay, Eldon, John A. Woodbridge, St. Louis, of counsel, for appellant.

George H. Miller, Sedalia, Ralph B. Nevins, Hermitage, for respondents.

VAN OSDOL, Commissioner.

Plaintiffs, who owned and cultivated a farm on the Osage River and who rented and cultivated other adjacent land, instituted this action against defendant to recover damages to crops due to overflow of the lands during the months of June and July, 1951. A jury awarded plaintiffs $12,783.50 in damages, and defendant has appealed from the ensuing judgment.

Plaintiffs' lands lie along the left bank of the Osage ten or twelve miles below the boundary line of Henry and St. Clair Counties and approximately twenty miles (by water) upstream from Warsaw.

The Osage River is a natural watercourse which flows generally in an easterly course from the Missouri-Kansas line through the counties of Bates, St. Clair, Benton, Camden, Morgan and Miller to Bagnell, thence on to its junction with the Missouri River near Jefferson City. In the years 1929-31 defendant constructed a dam across the Osage near Bagnell and installed a hydroelectric generating plant. The dam is approximately ninety-five miles downstream from Warsaw and impounds water in a large irregularly shaped lake well known as the Lake of the Ozarks. When the lake is at the stage of 660 feet above mean sea level its waters cover approximately sixty thousand acres, and the lake "feathers out" at the county line between Henry and St. Clair Counties. The Pomme de Terre River flows northwardly into the Osage about fourteen miles upstream from Warsaw, and when the lake is at the elevation of 660 feet the water of the lake extends upstream in the Pomme de Terre to a point several miles from the confluence of the Pomme de Terre and the Osage.

Plaintiffs' case was on the theory of tort in the nature of trespass—that their property (crops) was damaged and destroyed because of defendant's installations in damming up the Osage with resultant silting so that its waters were obstructed and cast back upon the lands owned or possessed by plaintiffs, interrupting plaintiffs' possession and destroying their crops. Kennedy v. Union Elec. Co. of Mo., 358 Mo. 504, 216 S.W.2d 756; Ferguson v. Union Elec. Co. of Mo., Mo.Sup., 305 S.W.2d 401; Vol. 2, Farnham on Waters and Water Rights, § 547, pp. 1767–1769. And, in the trial of this case, the issues although sharp were simple —did defendant's installations including its dam and its lake, and the subsequent silting of the river and its tributaries cause plaintiffs' lands to be flooded in June and July, 1951, and their crops to be damaged and destroyed, or was the rainfall and runoff therefrom in the Osage River basin and watershed, during the months of June and July, 1951, of such magnitude that water would have flooded plaintiffs' lands and destroyed their crops even though defendant's dam had never been built.

These issues were submitted to the jury by plaintiffs' verdict-directing Instruction No. 1 and by defendant's verdict-directing Instruction No. 4.

Plaintiffs' Instruction No. 1 was as follows,

> "The Court instructs the jury that if you find and believe from the evidence that in the months of June and July, 1951, the defendant Union Electric Company, owned and operated a hydroelectric dam across the Osage River at Bagnell, Missouri, and if you further find that said dam impounded the waters of the Osage River, creating a reservoir which at full stage of 660 feet above mean sea level extended from Bagnell, Missouri, to approximately the county line between Henry and St. Clair Counties; and if you further find and believe that at said time the plaintiffs owned a farm and had rented an adjoining farm for the crop year of 1951 and that said farms lay along the Osage River approximately 10 to 12 miles down stream from said county line bridge and being so situated were upon the lake of the Ozarks; and if you further find and believe from the evidence that in the latter part of June and in July of 1951 said Osage River became flooded to the extent that the crop land belonging to plaintiffs and being rented by plaintiffs and described in evidence became flooded and the crops thereon described in evidence were destroyed; and if you find and believe from the evidence that *under all the conditions then and there existing* plaintiffs' crops would not have been flooded and destroyed had it not been for the maintenance and operation of the said Bagnell Dam by defendant, (if you so find); and if you find that the flooding of the crop land in question and the destruction of the crops thereon directly and proximately resulted from the construction, maintenance and operation of the dam, and that thereby plaintiffs suffered loss and damage, then your verdict should be for the plaintiffs and against the defendant." (Our italics.)

Defendant's Instruction No. 4 was as follows,

> "The Court instructs the jury that if you find and believe from the evidence that the rainfall and runoff therefrom in the Osage River Basin and watershed in June and July, 1951, was of such magnitude that the water would have flooded and destroyed the plaintiffs' crops and pastures even though the defendant's dam had never been built, then your verdict must be for the defendant."

It is unnecessary in detail to here describe defendant's installations. The site and setting of defendant's dam and lake, the power-generating turbines through the

dam, the floodgates and manner of their control, as well as the clearing of timber from the lands acquired by defendant in contemplation of the completion of the dam and the impounding of water upstream from the dam, have been described in a number of cases reviewed by the appellate courts. In these decisions, the law generally governing cases of this nature has become established. See Ferguson v. Union Elec. Co. of Mo., supra, 305 S.W.2d 401; Id., Mo., 282 S.W.2d 505; Kennedy v. Union Elec. Co. of Mo., supra; Cunningham v. Union Elec. Co. of Mo., Mo.App., 221 S.W.2d 758.

In the trial of this case there was no issue relating to the facts that plaintiffs' lands were inundated and their crops destroyed by flood in June and July, 1951, and defendant-appellant does not contend herein that plaintiffs failed to make out a submissible case on the theory that the overflow and damage to plaintiffs' crops was due to the construction, maintenance and operation of defendant's installations. Compare Ferguson v. Union Elec. Co. of Mo., supra, 305 S.W.2d 401.

Defendant-appellant's sole contention herein is that plaintiffs' verdict-directing Instruction No. 1 was erroneous in that it did not require the jury to find facts "essential in law" to support a verdict in favor of plaintiffs. It is argued that the instruction merely gave the jury a roving commission to find for plaintiffs if the jury found that "under all the conditions then and there existing" their crops would not have been flooded and destroyed but for the maintenance and operation of defendant's dam, and if the jury further found that the flooding and destruction of plaintiffs' crops "directly and proximately resulted from the construction, maintenance and operation" of the dam. Defendant-appellant says there "is no way to tell now whether the jury found that the silting contributed to cause plaintiffs' damage or whether the jury found that the Lake itself retarded the floodwaters and thereby caused plaintiffs' damage or whether they (the jury)

found that failure to open the gates in the dam sufficiently caused plaintiffs' damage." In support of its contention defendant-appellant cites Levin v. Caldwell, Mo.Sup., 285 S.W.2d 655; Ferguson v. Union Elec. Co. of Mo., supra, 282 S.W.2d 505; Ferguson v. Betterton, 364 Mo. 997, 270 S.W.2d 756; Fadler v. Chicago, R. I. & P. R. Co., Mo.App., 251 S.W.2d 835; Devoto v. St. Louis Public Service Co., Mo. App., 238 S.W.2d 66. Defendant-appellant also cites and quotes from Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, 500, as follows,

> "Where the evidence presents two or more divergent sets of essential facts, under one or more of which plaintiff would be entitled to recover and under one or more of which he would not, then a verdict-directing instruction or instructions given in his behalf should hypothesize, either by recital or by reference to other instructions, the facts essential in law to support the verdict. * * *"

Plaintiffs-respondents, on the other hand, contend that the cases cited by defendant were negligence cases; and they say that plaintiffs' submission in the instant case was not of negligence but in trespass, and that the instruction (No. 1) was not erroneous in failing to particularly set out or hypothesize and specifically submit the "conditions then and there existing."

There can be no question as to the general rule that a plaintiffs' verdict-directing instruction should hypothesize and submit, either by recital or by reference to other instructions, the facts essential in law to support plaintiffs' recovery. And the negligence cases cited by defendant-appellant exemplify applications of the rule to various sets of facts. For example, in Ferguson v. Union Elec. Co. of Mo., supra, 282 S.W.2d 505, plaintiffs took the position that the proximate cause of the 1951 overflow and plaintiffs' resulting damages was not the presence of the dam and lake as such and the maintenance and

operation thereof (operation in the sense of generally operating), but rather was the result of negligence, specifically in failing to open floodgates sufficiently. Plaintiffs' theory of negligence of defendant was submitted in plaintiffs' verdict-directing Instruction No. 2, which was held erroneous in failing to require a finding that defendant knew or in the exercise of reasonable care should have known that unless its floodgates were opened plaintiffs' lands would be flooded. We note that the fact of defendant's knowledge, actual or constructive, was held essential in that case in order to establish defendant's duty to act, and, consequently, that defendant was negligent in failing to act in the performance of the duty. Absent the requirement of the finding of knowledge in the instruction, the instruction did not correctly submit negligence in an actionable sense.

Although the essential elements of negligence and trespass are different, the general rule that a plaintiff's verdict-directing instruction should submit facts essential in law to a recovery is also applicable in an action in the nature of trespass. See Jennemann v. Hertel, Mo.App., 264 S.W.2d 911, cited by defendant-appellant. In the Jennemann case, plaintiffs' action was to recover the value of trees, rose bushes and other plants allegedly destroyed by defendant's excavations. There was no showing that plaintiffs' lands on which the plants were growing was in its natural state or condition. This proof was necessary to plaintiffs' recovery on a theory of trespass by withdrawal of lateral support. But there was evidence that plaintiffs' plants were destroyed by the projection of defendant's excavating machine beyond the boundary of plaintiffs' land. Thus, there was evidence tending to show trespass by unlawful entry; but this evidence was contradicted by defendant, and, therefore, plaintiffs' verdict-directing instruction given in the Jennemann case was erroneous in failing to submit and require the finding of the essential and disputed fact of entry.

It is not reversible error, however, to omit from an instruction the specific hypotheses of facts which are undisputed and in effect conceded. Banks v. Koogler, Mo.Sup., 291 S.W.2d 883; Byrnes v. Poplar Bluff Printing Co., Mo.Sup., 74 S.W.2d 20; Yontz v. Shernaman, Mo.App., 94 S.W.2d 917; Lewis v. Terminal R. Ass'n of St. Louis, Mo.App., 61 S.W.2d 234.

In the instant case the transcript on appeal is voluminous in reflecting evidence introduced tending to show the setting of defendant's dam and its hydro-electric installations; the consequent silting in the bed of the Osage and along the banks of the Osage and of islands upstream and along the margins of tributaries, and in depressions or sloughs; and the effect of the dam and lake and silt in narrowing the channel, slowing and backing up the waters and inundating lands in the valleys of the river and its tributaries. There was evidence tending to show silting at Walthal and Towhead Islands at Warsaw; at Wingate Island upstream from Warsaw and the mouth of the South Grand River; at Smart Island upstream and to the westward of plaintiffs' land; at and near the mouth of the Pomme de Terre; and in depressions or sloughs along the Osage. Experts testified, and there was official statistical data introduced tending to show the rainfall in former years and on stated days of the months of June and July, 1951, in areas within the watershed of the Osage; and there also was introduced the testimony of laywitnesses who had lived in the vicinity of the Osage for years and had observed and were acquainted with the effect of rainfall in causing the waters to rise and flood the river-valley lands in 1951 and in prior years.

We think it unnecessary to extend this opinion by more particularly stating the facts relating to the construction, maintenance and operation of defendant's installations including floodgates, or the presence of the resultant silt which had

accumulated along the banks and in the channels of the Osage and its tributaries. There was little if any dispute concerning these conditions, or that they were parts or the result of defendant's installations. The real issue was whether under these conditions and under the further shown and undisputed "conditions" of the unusually heavy rainfall and runoff therefrom during the months of June and July, 1951, plaintiffs' lands would or would not have been flooded and their crops destroyed had it not been for the construction, maintenance and operation of its dam and installations; that is, the real adversary issue was the *effect* of these conditions singly or in combination *in causing* the flooding of plaintiffs' lands. This is illustrated by referring to defendant-appellant's brief in which asserted "essential facts" are said to have been in issue and upon which, defendant-appellant says, the evidence of plaintiffs and of defendant was in sharp conflict. We shall mention the first three of them, quoting from defendant-appellant's brief.

(1) Plaintiffs' evidence was—"Silting at Walthal and Towhead Islands at Warsaw and Wingate Island has restricted the channel by one third," whereas defendant's evidence was—"Silting at Warsaw and upstream has not been enough to offset improved flowing conditions caused by the clearing (of timber) which had been done before the Lake was filled"; (2) plaintiffs' evidence was—"Silt at Smart Island sloughs restricts the channel of the river one fourth to one third," whereas defendant's evidence was—"Silt at Smart Island, gravel bars and Wing dam have no effect on flood flows"; and (3) plaintiffs' evidence was—"The higher a flood gets the farther back up the Lake the dam and the Lake retard the water," whereas defendant's evidence was—"As (sic) the higher the flood rises in the River the slowing effect of the dam and the Lake is moved downstream." It is observed that defendant-appellant in these quotations does not indicate the evidence was in sharp conflict as to the "conditions" of silting and the high level of the waters at and around the named islands and in the body of the lake, but the quotations do demonstrate that the evidence was in sharp conflict on the issue of the effect of these conditions in restricting or retarding the flow of the waters and causing the overflow thereof onto plaintiffs' lands.

■ Now the respective divergent theories of the parties, plaintiffs and defendant, on the issue of "causation" between the construction, maintenance and operation of defendant's installations and the flooding of plaintiffs' lands and loss of crops was fairly and clearly submitted in Instructions Nos. 1 and 2, set out supra. We share with the Kansas City Court of Appeals the opinion that the evidence voluminously reflected in the record made fully known to the jury the conditions then and there existing hypothesized by the language we have emphasized supra in Instruction No. 1. Cunningham v. Union Elec. Co. of Mo., supra. And, we may add that, if defendant deemed the conditions then and there existing and their origin were not sufficiently or too generally hypothesized by the language of the instruction we have emphasized when read in connection with the clearly submitted issue of causation, defendant should have offered clarifying or amplifying instructions. Hooper v. Conrad, supra.

We hold that Instruction No. 1 was not prejudicially erroneous.

The judgment should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.